1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHN E. OWENS,

11            Plaintiff,                    No. CIV S-08-2665 MCE EFB

12        vs.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
              Defendant.              FINDINGS AND RECOMMENDATIONS
15   _____/

16          Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

17   ("Commissioner") denying his application for Social Security Disability Insurance Benefits

18   ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

19   Security Act.  For the reasons discussed below, the court recommends that defendant's motion

20   be granted and plaintiff's motion be denied.

21   I.  BACKGROUND

22          Plaintiff, born September 9, 1957, formally applied for DIB and SSI on February 17,

23   2006.  Administrative Record ("AR") 10.  His application alleged that he had been disabled

24   since April 30, 2004.  *Id.* at 8.  The application was denied initially and upon reconsideration,

25   and plaintiff requested an administrative hearing.  *Id.* at 16.  On January 8, 2008, a hearing was

26   held before administrative law judge ("ALJ") Sandra K. Rogers.  *Id.* at 17-40.  Plaintiff was

1  represented by counsel and testified at the hearing.  Also testifying was vocational expert

2  Stephen B. Schmidt.  *Id*.

3  　　　The ALJ issued a decision on April 24, 2008, finding that plaintiff was not disabled.[1]  *Id.*

4  at 8-16.  The ALJ made the following specific findings:

> 1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.
>
> 2.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).
>
> 3.  The claimant has the following severe impairment: Chronic Obstructive Pulmonary Disease (COPD) (20 CFR 4-4.1520(c) and 416.920(c)).
>
> ***
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 *et seq*.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 *et seq*.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits under both programs.  *See* 20 C.F.R. §§ 404.1520, 404.1571-76,  416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

　　　Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

　　　Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

　　　Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

　　　Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

　　　Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828, n.5 (9th Cir. 1995).

　　　The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  *Id.*

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and
416.926).

\*\*\*

5.  The claimant has the residual functional capacity to perform a
limited range of light work.  He can sit or stand/walk 6 hours in an
8 hour workday; lift/carry 20 lb. occasionally and 10 lb.
frequently; occasionally climb, balance, stoop, kneel, crouch, and
crawl; and should avoid concentrated exposure to fumes, odors,
dusts, gases, poor ventilation, etc.

\*\*\*

6.  The claimant is unable to perform any past relevant work (20
CFR 404.1565 and 416.965).

\*\*\*

7.  The claimant was born on September 9, 1957 and was 46 years
old on the alleged disability onset date, which is defined as a
younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.  The claimant has a high school education and is able to
communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because
the claimant's past relevant work is unskilled (20 CFR 404.1568
and 416.968).

\*\*\*

10.  Considering the claimant's age, education, work experience,
and residual functional capacity, there are jobs that exist in
significant number in the national economy that the claimant can
perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

\*\*\*

11.  The claimant has not been under a "disability," as defined in
the Social Security Act, from April 30, 2004 through the date of
this decision (20 CFR 404.1520(g) and 416.920(g)).

*Id.* at 8-16.

Plaintiff requested that the Appeals Council review the ALJ's decision.  However, on

September 6, 2008, the Appeals Council denied review, leaving the ALJ's decision as the "final

decision of the Commissioner of Social Security."  *Id.* at 1-4.

3

II. <u>MEDICAL EVIDENCE</u>

    A. <u>Chronic Obstructive Pulmonary Disease (COPD)</u>

    In May 2004, plaintiff was admitted to San Joaquin General Hospital for shortness of breath, fever, and a cough. AR 193-95, 197-200, 202-207, 252-57. Pulmonary function tests revealed findings consistent with mild to moderate chronic obstructive pulmonary disease (COPD). On discharge, he was diagnosed with bilateral pneumonia, COPD, and hyperthyroidism and was prescribed Atrovent, Albuterol, Azmacort, Allegra, Doxycycline and Prednisone staring with a taper dose. *Id.* Follow-up pulmonary function testing on May 26, 2004 revealed mild obstructive airway disease with air trapping and normal diffusion capacity. AR 196.

    In June 2004, plaintiff was diagnosed with chronic bronchitis, COPD, hyperthyroidism, and anemia, and was referred for further testing. AR 190-91. A chest x-ray in July 2004 revealed bullous emphysema. AR 188. A CT scan in September 2004 showed right upper lobe apical blebs, AR 187, and another chest x-ray in September 2004 showed COPD with probable mild associated CHF, question of minimal right infrahilar pneumonia or atelectasis. AR 183. On November 4, 2004, a chest x-ray confirmed a decrease in right lower lobe infiltrate and atelectasis and no change in prominent bullous disease. AR 181.

    On November 18, 2004, plaintiff was seen at San Joaquin General Hospital. AR 180. Plaintiff reported shortness of breath and a cough, and stated that he had smoked for 15 years and had used "rock cocaine" for 13 months. *Id.* The examination revealed emphysema, and plaintiff was referred to a pulmonologist. *Id.*

    On December 7, 2004, a chest x-ray showed "some middle lobe atelectasis, perhaps slightly better than on the last examination," and "extensive emphysematous changes in the upper lobes, particularly on the right." AR 179. A CT scan on December 23, 2004 showed prominent bullous disease of both lungs not significantly changed since September 7, 2004 except for a new small bleb in the periphery of the right middle lobe. AR 178.

////

On January 13, 2005, plaintiff was seen at San Joaquin General Hospital's Family Practice for a cough and pain associated with the coughing.  AR 176.  It was opined that plaintiff was in need of a bronchoscopy with a pulmonologist, was prescribed Prednisone and Tylenol #310, and was referred for further treatment.  *Id.*

On February 10, 2005, plaintiff was examined by his physician, Dr. Ahmed Mahmoud, at San Joaquin General Hospital.  AR 175.  Plaintiff was diagnosed with COPD, asthma, chronic bronchitis, poor pulmonary function tests, and intermittent steroid therapy.  *Id.*

On February 22, 2005, plaintiff was treated at San Joaquin General Hospital's Family Practice for cough and difficulty breathing.  AR 174.  He was diagnosed with severe COPD with emphysema, allergic rhinitis, and chronic low back pain secondary to degenerative joint disease.  *Id.*  He was prescribed Albuterol and a nebulizer machine, Atrovent and Vicodin.  *Id.*

On May 25, 2005, pulmonary function testing showed that plaintiff had mild obstruction, premedication, and mild restriction, postmedication.  AR 170-72.

On November 6, 2005, plaintiff was seen at San Joaquin General Hospital and described a productive cough for the past three days, worsening shortness of breath, headache, chest pain and fever.  AR 232.  Plaintiff was admitted after having a positive chest x-ray that showed right middle and lower lobe pneumonia.  *Id.*  On November 9, 2005, he was discharged in fair condition and was diagnosed with pneumonia, COPD, hyperthyroidism, and polysubstance abuse.  *Id.*

In January 2006, an examination of plaintiff revealed bilateral wheezing in the lungs, and plaintiff was diagnosed with an exacerbation of COPD.  AR 332.  In February 2006, plaintiff was seen regarding his worsening cough and worsening back aches.  AR 331.  On March 21, 2006, plaintiff underwent another CT scan of the chest that showed apical bullous emphysematous changes, considerably greater on the right, and the 4.5 cm bulla or bleb was seen at the right base anterolaterally.  AR 230.  As of May 2006, plaintiff continued to report shortness of breath and a cough, and was diagnosed with bullous emphysema.  AR 330.

On June 4, 2006, plaintiff received treatment at San Joaquin General Hospital for back pain. AR 326-28. On June 5, 2006, plaintiff underwent pulmonary function testing (PFT). AR 266-80. The PFT showed moderate obstructive airway disease based on low FVC (66% predicted), low FEV1 (58% predicted) and low flow rate. *Id.* Significant improvement in FVC and FEV1 was noted on bronchodilator use and variable reproducibility was noted on post-bronchodilator test. AR 266.

On June 20, 2006, P.A. Bianchi, M.D., completed a physical residual functional capacity assessment of plaintiff, and opined that plaintiff was capable of performing light work consisting of frequently carrying 10 pounds and occasionally carrying 20, sitting, standing and walking for 6 hours, occasionally climbing, balancing, stooping, kneeling, crouching, and crawling, and avoiding concentrated exposure to fumes, odors, dusts, gas, and poor ventilation. AR 281-88. On June 29, 2006, he was seen at San Joaquin General Hospital's Family Practice for COPD and lower back pain. AR 324.

In December 2006, plaintiff was seen at San Joaquin General Hospital for shortness of breath and a cough. AR 320-23; 334-37. An examination of plaintiff revealed wheezing and rales in his chest and he was diagnosed with COPD. *Id.* From January 2007 to October 2007, plaintiff was also treated for his COPD and lower back pain. AR 333; 365-67; 370-73.

B. Mental Diagnoses/Conditions

In 1993, plaintiff complained of insomnia, paranoia, nightmares, decreased memory, poor concentration, intrusive thoughts, and stress. AR 217-27. He was diagnosed with Cocaine Delusional Disorder and Depressive Disorder NOS. *Id.* He was in a cocaine/drug treatment program at the time. *Id.*

In January 2006, plaintiff was treated at San Joaquin Mental Health Services. AR 214, 360-63. He reported hearing voices, depression, and feelings of isolation because he was afraid to be hurt. AR 214; 362-63. He stated his girlfriend had lost their baby in a car wreck and he heard the baby calling "daddy." AR 214; 360. He also reported that his friend died recently and

that he continued to see, hear and talk to him.  AR 213; 359.  Examinations revealed crying, sadness, and hopelessness, a depressed mood, and a reported loss of sleep and appetite.  AR 214; 359-61.  He was diagnosed with psychotic disorder and was referred for further treatment.  AR 363.

On February 14, 2006, Dr. Graff, of San Joaquin Mental Health Services, stated that plaintiff was "dramatic, thrashing about, speaking forcefully, whining, crying w/o tears"; that plaintiff "reports visual hallucinations and is unable to answer orientation questions despite excellent memory for recent event"; and that plaintiff was "endorsing questions of malingering." AR 213.  He opined that plaintiff was malingering, had a personality disorder, and was engaged in drug abuse.  *Id.*

On May 9, 2006, plaintiff was evaluated by consultative psychologist David C. Richwerger, Ed.D.  AR 258-64.  Dr. Richwerger reported that plaintiff stated he had a history of outpatient psychiatric treatment due to hearing voices, and has difficulty with his memory, hears ongoing voices, sees people on the walls, has troubling thoughts, often feels anxious and depressed, and had suicidal ideations about two weeks prior.  AR 259.  Plaintiff stated that he was taking Seroquel.  *Id.*  Plaintiff states that he did not sleep well because he heard voices and thought someone was trying to kill him, was dependent on others for daily activities and financial issues, and did not like to be around people.  *Id.*

Dr. Richwerger's examination revealed that plaintiff made ongoing jaw flicking motions and a growling sound and did not make eye contact.  AR 261.  He was oriented to person and place, did not know the date (but knew the year), and did not know the purpose of his evaluation. *Id.*  His verbal responses were often mumbled and very difficult to understand, his thought processes were tangential, he often looked around the room, and he insisted that the blinds be closed and the door open, then he closed the door and opened it again.  *Id.*  He had difficulty with simple tasks and was not able to respond to complete tasks, and was agitated, irritable and paranoid.  *Id.*  Dr. Richwerger's memory testing revealed that plaintiff was in the 0.2 percentile

7

on verbal memory tasks and was in less than the 0.1 percentile on concentration and attention tasks. *Id.* He was only able to remember two digits forward and zero digits backward. *Id.* He did not respond to abstraction or to judgment tasks and his reality contact appeared impaired. *Id.* Dr. Richwerger attempted to conduct a memory malingering test, but the test could not be completed because plaintiff did not appear capable of focusing on the test stimulus cards. *Id.*

Plaintiff could not focus on many of the tests Dr. Richwerger attempted to conduct and became agitated. AR 262. His verbal IQ was 56 and his performance and full scale IQ could not be determined. *Id.* Dr. Richwerger opined that plaintiff "appeared to be affected by the presence of a psychotic process," and diagnosed plaintiff with schizophrenia, paranoid type, and a Global Assessment of Functioning (GAF) score of 40.[2] AR 262-63. Dr. Richwerger recommended that plaintiff return to his treating psychiatrist and opined that plaintiff would have extreme impairment in his ability to perform detailed and complex tasks, simple and repetitive tasks and had great difficulty with any task presented to him; to perform work activities on a consistent basis; to perform work activities without special supervision; to complete a normal workday or workweek without interruption from a psychiatric condition; to understand and accept instructions from supervisors; to interact with co-workers and the public; to maintain regular attendance in the workplace; to deal with the usual stressors encountered in competitive work; and to manage his own funds. AR 263-64.

On May 17 and 23, 2006, Charles Wood, LCSW, at the San Joaquin Mental Health Services examined plaintiff and noted that although plaintiff stated that he continued to hear voices and have insomnia, and felt that someone was out to get him, plaintiff did not appear to be

---

[2] The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." The American Psychiatric Association's Multiaxial Assessment, set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th Ed. 2005), at 34. A GAF of 31 to 40 denotes "some impairment in reality testing or communication" (e.g., speech is at times illogical, obscure, or irrelevant) OR "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id.*

responding to internal stimuli and did not appear sleep deprived.  AR 356.

On August 16, 2006, State Agency psychiatrist A.R. Schrift, M.D., concluded that plaintiff did not suffer from a mental impairment.  AR 289.  He noted that all of the medical record of evidence regarding plaintiff's COPD described him as intact, oriented, not psychotic, and able to give a coherent history.  AR 309.  Dr. Schrift stated that plaintiff's "allegations are just not credible.  His descriptions of AH & HV, plus not knowing the year are very suspicious.  In fact as discharge in 11/05 he had a benign MSE. [Plaintiff] most likely malingering or at the very least exaggerating his [symptoms]."  *Id.*  Dr. Schrift also noted that although plaintiff claimed to be sober for years, his urine screens were positive for cocaine and cannabis when he was admitted for three days for his COPD.  *Id.*  R. Tashijian, M.D., reviewed Dr. Schrift's assessment and affirmed it in February of 2007.  AR 348.

On November 14, 2007, consultative psychologist Dr. Les Kalman, examined plaintiff.  AR 382-90.  Plaintiff reported difficulty sleeping and voices telling him not to go to sleep, and stated that he did not like to be around people.   AR 382.  Dr. Kalman's examination revealed that plaintiff was dressed and groomed, had normal posture and gait, and had some shaking of the upper extremities.  *Id.*  Plaintiff was slumped to the side of his chair, kept his eyes closed through most of the interview, and responded to questions rather laconically with brief, terse responses.  *Id.*  He reported being laid off for not showing up to work.  Id.

The examination further revealed that plaintiff was not very cooperative and appeared lethargic and disinterested.  AR 383.  His responses were delayed; he appeared lethargic but was oriented to person, place and time; he recalled two of three objects at five minutes; he was able to do four digits forward, three digits backward; he could do serial 3's with three errors; he could add, subtract, and multiply; his abstracts were intact; he did not know any proverbs; and insight into his mental illness and judgment were poor.  *Id.*  His mood was irritable, apathetic and sad; his affect was flat; and he denied any suicidal or homicidal thoughts.  AR 384.  His thought process was significant for vague, poverty of ideas, and there were no loose associations, mood

swings or emotional liability.  *Id.*  Plaintiff reported delusions of a prosecutory nature, feeling

people were after him, with ideas of reference that the television was talking about him.  *Id.*  He

was capable of caring for his own personal hygiene but did not perform any other daily

activities, did not have any friends, and did not like to be around people.  *Id.*  He was

uncooperative with the interview, giving minimal responses, at times seeming to listen and other

times not.  *Id.*  He was diagnosed with polysubstance dependence in remission, psychosis, and

emphysema and was assigned a GAF of 50.[3]  *Id.*  His condition was not expected to improve

significantly in the next twelve months and he was not competent to manage his own funds.  AR

385.

       After examining plaintiff, Dr. Kalman completed a mental impairment statement opining

that plaintiff was not significantly limited in his ability to understand and remember very short

and simple repetitive instructions; was mildly limited in his ability to remember locations and

work-like procedures, to carry out short and simple instructions or tasks, to maintain attention

and concentration for extended periods, to perform activities within a schedule, to sustain an

ordinary routine without special supervision, to make simple work-related decisions, to ask

simple questions or request assistance, to maintain socially appropriate behaviors, to respond

appropriately to expected or unexpected changes, to be aware of hazards and take precautions, to

travel in unfamiliar places, and to set realistic goals; and he was moderately limited in his ability

to understand and remember detailed instructions or tasks, to carry out detailed instructions, to

work in coordination with or proximity to others without being unduly distracted by them, to

complete a normal workday and workweek without interruption from psychologically based

symptoms, to perform at a consistent pace without an unreasonable number and length of rest

periods, to interact appropriately with the general public or customers, to accept instructions and

---

[3] A GAF of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifiting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job)."

1   to respond appropriately to criticism from supervisors, and to get along with co-workers or peers

2   without unduly distracting them or exhibiting behavioral extremes.  AR 387-89.  He would have

3   an increased level of impairment beyond those indicated above with unruly, demanding, or

4   disagreeable customers even on an infrequent basis, production demands or quotas, demand for

5   precision, a need to make quick and accurate, independent decisions in problem solving.  AR

6   389.  Dr. Kalman opined that plaintiff was not the type of person for whom a routine, repetitive,

7   simple, entry-level job would serve as a stressor which would *exacerbate* instead of mitigate

8   psychological symptoms in the workplace.  *Id.*

9   III.  ISSUES PRESENTED

10          Plaintiff contends that the Commissioner erred in sustaining the ALJ's determination that

11  he is not disabled by (1) minimizing plaintiff's mental illness based on an erroneous finding that

12  plaintiff was malingering and that he did not have any limitations arising from his mental

13  impairment; (2) finding, contrary to the vocational expert's specific testimony, that plaintiff

14  would be able to use his breathing apparatus during the work day during lunch and other breaks;

15  and (3) failing to articulate specific and legitimate reasons for not crediting the consulting

16  examining opinions of Drs. Richwerger and Kalman.  Dckt. No. 17 at 4.

17  IV.  LEGAL STANDARDS

18          The Commissioner's decision that a claimant is not disabled will be upheld if the findings

19  of fact are supported by substantial evidence in the record and the proper legal standards were

20  applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000);

21  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*,

22  180 F.3d 1094, 1097 (9th Cir. 1999).

23          The findings of the Commissioner as to any fact, if supported by substantial evidence,

24  are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

25  more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521

26  (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

1   support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

2   *Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

3          "The ALJ is responsible for determining credibility, resolving conflicts in medical

4   testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

5   2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

6   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

7   *Thomas v. Barnhart*, 278  F.3d 947, 954 (9th Cir. 2002).

8   V.  <u>ANALYSIS</u>

9          A.      <u>ALJ's Finding that Plaintiff's Schizophrenia Was Not a Severe Impairment</u>

10         Plaintiff contends that the ALJ erred in failing to find that plaintiff suffered from a severe

11  mental impairment and in minimizing the limitations arising from his psychosis and

12  schizophrenia.  Pl.'s Mot. for Summ. J. at 12.  Plaintiff contends that the ALJ "*completely*

13  *discounts* the existence of a mental impairment due to her implicit finding that he was

14  malingering, even though multiple providers opined that [plaintiff] suffered from significant

15  mental limitations arising from his mental impairment."  *Id.* at 12-13.  Plaintiff argues that the

16  malingering finding "is contrary to his medical history and the opinions of multiple medical

17  sources - including the government's own expert."  *Id.* at 13.

18         According to plaintiff, the ALJ heavily relied upon a January 2006 progress note in

19  which Dr. Graff assigned plaintiff an Axis One diagnosis of malingering but also assigned

20  plaintiff an Axis II diagnosis of personality disorder.  *Id.* at 13 (citing AR 213).  Plaintiff

21  contends that the ALJ ignored the personality disorder diagnosis and therefore mistakenly

22  concluded that plaintiff did not have a mental impairment that caused any limitations.  *Id.*

23  Plaintiff notes that in May 2006 Charles Wood, plaintiff's treating therapist, again diagnosed

24  plaintiff with an Axis II diagnosis of 301.9, which corresponds to personality disorder, not

25  otherwise specified, and assigned plaintiff a GAF of 50, indicating serious symptoms and

26  limitations due to his mental impairment.  *Id.* (citing AR 357).  Plaintiff argues the "ALJ never

discussed Dr. Graff's opinion that [plaintiff] suffered from personality disorder and instead

jumped to the conclusion that he was malingering as to mental illness in general." *Id.* at 14.

Plaintiff also contends that "the ALJ's opinion that the medical experts (including Dr.

Richwerger who was the Commissioner's own expert) were 'taken in' when they diagnosed

[plaintiff] with schizophrenia (Tr. 263) and psychosis not otherwise specified (Tr. 384) was

based on an incorrect assumption that did not include a co-diagnosis of personality disorder." *Id.*

Plaintiff adds that "all evidence has been consistent as to a personality disorder at a minimum."

*Id.* at 17.

Defendant counters that "based on the medical evidence, the ALJ properly found only

Plaintiff's COPD as a severe impairment." Def.'s Mot. for Summ. J. at 4.  Defendant contends

the ALJ relied on various medical sources, and that "[c]ontrary to Plaintiff's contention, the ALJ

did not base her mental impairment finding solely on a medical opinion that Plaintiff engaged in

malingering. . . .  The ALJ also found that Plaintiff's testimony was not credible, a challenge

Plaintiff does not contest." *Id.* at 4, 5.  Defendant further contends that "[b]ecause the ALJ in

this case found that Plaintiff had severe impairments at step two, the question of whether she

characterized any other alleged impairments as 'severe' or 'not severe' was of little significance,

as long as she accommodated any actual limitations Plaintiff had in the RFC finding. . . .  Here,

the ALJ fully considered all of Plaintiff's impairments, including his mental impairments, and

accommodated Plaintiff's limitations that were supported in the record in the RFC finding." *Id.*

at 5.

To the extent plaintiff challenges the step two determination that plaintiff's mental

impairments were not severe, plaintiff's argument fails.  "The step-two inquiry is a de minimis

screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th

Cir. 1996).  The purpose is to identify claimants whose medical impairment is so slight that it is

unlikely they would be disabled even if age, education, and experience were taken into account.

*Bowen*, 482 U.S. at 153.  At step two of the sequential evaluation, the ALJ determines which of

1    claimant's alleged impairments are "severe" within the meaning of 20 C.F.R. § 404.1520(c).  A

2    severe impairment significantly limits a person's physical or mental ability to do basic work

3    activities.  *Id.*  "An impairment is not severe if it is merely 'a slight abnormality (or combination

4    of slight abnormalities) that has no more than a minimal effect on the ability to do basic work

5    activities."  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citing Social Security Ruling

6    ("SSR") 96-3p (1996)).  If a severe impairment exists, all medically determinable impairments

7    must be considered in the remaining steps of the sequential analysis.  20 C.F.R. § 404.1523.  The

8    ALJ "must consider the combined effect of all of the claimant's impairments on her ability to

9    function, without regard to whether each alone [i]s sufficiently severe."  *Smolen*, 80 F.3d at

10    1290; 20 C.F.R. § 404.1523.

11      Here, the ALJ found that plaintiff's only severe impairment was COPD.  Plaintiff

12    argues that the ALJ should have also found her mental impairments to be "severe" at step two.

13    Regardless of whether plaintiff's mental impairments were in fact severe, plaintiff's argument

14    ignores the function of step two as a gatekeeping mechanism to dispose of groundless claims.

15    Once a plaintiff prevails at step two, regardless of which condition is found to be severe, the

16    Commissioner proceeds with the sequential evaluation, considering at each step all other alleged

17    impairments and symptoms that may impact her ability to work.  *See* 42 U.S.C. § 423(d)(2)(B).

18    Here, plaintiff prevailed at step two.  Therefore, plaintiff cannot prevail based on his argument

19    that the ALJ failed by not finding his mental impairments to be severe.[4]

20    ////

21

22      [4] To the extent plaintiff argues that the ALJ minimized the limitations arising from his
psychosis and schizophrenia at steps four or five in the sequential evaluation, the ALJ did

23    consider all of plaintiff's impairments, including his mental impairments, that the ALJ found to
be credible.  AR 12.  Plaintiff does not challenge the ALJ's credibility findings.  *See Rudebusch*

24    *v. Hughes*, 313 F.3d 506, 521 (9th Cir. 2002) (refusing to address argument that was not raised in
party's opening brief).  Plaintiff's specific argument that the ALJ erred during step five of the

25    sequential evaluation by failing to articulate specific and legitimate reasons for not crediting the
consulting examining opinions of Dr. Richwerger and Dr. Kalman is addressed below in

26    subsection (C).

1      Moreover, the ALJ relied on several sources in reaching her conclusion that plaintiff did

2   not suffer from a severe mental impairment.  The ALJ noted that although plaintiff was "initially

3   diagnosed with Psychosis NOS," in February 2006, Dr. Graff's assessments "were malingering

4   and drug abuse."  AR 11 (referencing AR 213).  Although the ALJ stated that the consultative

5   examiners (Drs. Richwerger and Kalman) appeared to be "taken in" by plaintiff, the ALJ

6   specifically noted that Richwerger was unable to objectively test plaintiff for malingering and

7   that plaintiff was uncooperative during his interview with Kalman.  AR 11-12.  Plaintiff

8   contends it was erroneous for the ALJ to "ignore" Dr. Graff's additional personality disorder

9   diagnosis and to disregard the opinions of Drs. Richwerger and Kalman as having been "taken

10  in" by plaintiff.  However, the ALJ provided significant support for her decision.[5]  The ALJ

11  pointed out that the most recent chart notes from May 2006 indicated that despite plaintiff's

12  allegation of difficulty sleeping because of hearing voices, "he did not appear to be sleep

13  deprived or responding to internal stimuli" and there was no evidence plaintiff was responding to

14  voices.  AR 11 (referencing AR 356).  The ALJ further noted that plaintiff gave inconsistent

15  information concerning his drug use.[6]  AR 11.  The ALJ also relied on the opinion of state

16  agency physician, Dr. Schrift, who found that plaintiff had no psychiatric symptoms that would

17  interfere with his ability to do work-related activities, that the medical evidence concerning

18  plaintiff's COPD described him as intact, oriented, not psychotic, and able to give a coherent

19  history, as well as Dr. Tashijian, who affirmed Dr. Schrift's assessment.  AR 11 (referencing AR

20  289, 309, 348).  Because the ALJ had significant evidence to support her finding that plaintiff

21  did not suffer from a severe mental condition, plaintiff is not entitled to relief on this ground.

22

23         [5] Also, although plaintiff contends the ALJ erred by failing to consider Dr. Graff's
    personality disorder diagnosis, a mere diagnosis of an impairment is not sufficient to show
24  severity.  *See Sample v. Schweiker*, 694 F.2d 639, 642-43 (9th Cir. 1989) ("The existence of an
    emotional disorder . . . is not per se disabling . . . [t]here must be proof of the impairment's
25  disabling severity").

26         [6] As noted above, plaintiff does not challenge the ALJ's credibility findings.

1          B.      Plaintiff's Breathing Device

2          Plaintiff further contends that the ALJ erred by mischaracterizing the vocational expert's

3    testimony regarding plaintiff's use of a breathing device.  Pl.'s Mot. for Summ. J. at 18.  Plaintiff

4    contends that the ALJ's conclusion that although plaintiff "may at times be symptomatic, he

5    could use inhalers/nebulizers before and/or after work, and during lunch or other breaks," AR

6    14, is "directly contrary to the vocational expert's response that specifically stated all work

7    would be precluded."  Pl.'s Mot. for Summ. J. at 18 (citing AR 37).  According to plaintiff, the

8    ALJ made a finding of fact in the hearing decision that plaintiff would need to use his

9    "nebulizer/inhaler" from time to time during the workday but could accomplish this during

10   lunches and breaks, while the VE specifically testified that plaintiff would not be able to use his

11   breathing apparatus during lunches and breaks because he is limited to unskilled work.  *Id.* at 19.

12         Defendant argues that, irrespective of the vocational expert's testimony, which is not a

13   medical opinion, plaintiff "has not demonstrated that he needed to use his breathing apparatus

14   for 45 minutes.  The only evidence for this is Plaintiff's testimony which the ALJ properly found

15   incredible based on, among other things, the minimal treatment Plaintiff has received for his

16   COPD, his noncompliance with his physicians' advice that he stop smoking, and history of drug

17   abuse."  Def.'s Mot. for Summ. J. at 6 (citing AR 13, 32, 259, 309, 329).  Defendant also notes

18   that plaintiff has not challenged the ALJ's credibility finding.  *Id.*  Defendant further contends

19   that "the ALJ did not state that using a breathing device for 45 minutes was necessary.  Rather,

20   the ALJ stated that '[a]lthough [Plaintiff] may at times be symptomatic, he could use his inhaler

21   before and/or after work, and during lunch or other breaks.  He could also stop smoking

22   cigarettes, as he has been advised by his physicians."  *Id.* (citing AR 14).  Accordingly,

23   defendant contends, "the ALJ did not state that Plaintiff needed 45 minutes to use his breathing

24   device [and instead] indicated that Plaintiff also had the option of quitting smoking."  *Id.*

25         The VE did testify that if plaintiff required "at least a 45 minute, straight 45 minute break

26   to use his [breathing device] during the working day," that would preclude employment since

"the types of jobs he's going to be working with . . . are generally half hour lunches . . . ."  AR
37.  However, plaintiff's arguments regarding that testimony suggest that plaintiff had no other
alternatives to using the breathing device for that time interval.  To the contrary, the ALJ
expressly stated in her decision that plaintiff "could also stop smoking cigarettes, as he had been
advised by his physicians."  AR 14.

Moreover, there was no evidence before the ALJ that plaintiff *needed* to use his breathing
device for 45 minutes straight or that he needed to do so during the work day.  Rather, when
asked about how long it takes plaintiff to set up the device and how long he wears the mask on
his face, plaintiff indicated that it takes him "about 10 minutes" to set up, and he wears the mask
for "about 45 minutes to an hour . . . because of the solution [he puts in], that's how long it takes
to run out."  AR 24.  When specifically asked if it takes "an hour to use it," he responded "yes."
AR 25.  Further, when asked how often he uses the device, plaintiff stated "I probably use it
three to four times a day."  AR 24.  When he was asked what times of day he is using it, he
responded, "I use it starting at eight in the morning, then two in the afternoon, then like eight at
night."  AR 25.  Plaintiff's responses did not suggest that he needed to use a certain amount of
solution or that he needed to use the device at any particular time of the day.  Additionally, the
ALJ specifically found that plaintiff was not entirely credible and that his symptoms were not as
severe as he alleged.  The ALJ stated:  "Considering the factors set forth in SSR 96-7p, I would
expect more treatment and even hospitalizations from one with symptoms as severe as the
claimant alleges.  I also note that he has at times been noncompliant, has a significant history of
drug abuse, and continues to smoke cigarettes.  He does not present as one highly motivated to
work, especially in light of his attempt to get food stamps when he was doing relatively well."
AR 14.  The ALJ obviously questioned whether plaintiff really needed to use the device during
the workday or that he needed at least 45 minutes of uninterrupted time to use the device, since
the ALJ stated that plaintiff "could use his inhalers/nebulizers before and/or after work, and
////

1    during lunch or other breaks."[7]  AR 14.  As noted above, plaintiff does not challenge the ALJ's

2    credibility finding.  Accordingly, plaintiff is not entitled to relief on this ground.

3          C.      <u>Consideration of Opinions of Consulting Examining Physicians</u>

4         Lastly, plaintiff argues that the ALJ erred by "failing to articulate specific and legitimate

5    reasons for discrediting Dr. Richwerger's (a psychologist) or Dr. Kalman's (a psychiatrist)

6    opinions other than a general statement that the consultants were 'taken in' by plaintiff."  Pl.'s

7    Mot. for Summ. J. at 21 (citing AR 12).  Plaintiff contends that the ALJ failed to recognize that

8    Dr. Graff, Mr. Woods, Dr. Kalman, and Dr. Richwerger all agreed that plaintiff had a personality

9    disorder and erroneously misread Dr. Graff's progress note and missed the diagnosis for

10   personality disorder.  *Id.* at 21.  Accordingly, plaintiff contends, the ALJ's analysis of the two

11   consultant opinions was "very skewed due to the ALJ's own bias based on a presumption of

12   malingering and lack of any mental impairment."  *Id.* at 22.  Plaintiff contends that the ALJ

13   never engaged in the proper analysis of Dr. Richwerger's and Dr. Kalman's opinions.  *Id.*

14        Defendant acknowledges that an ALJ must give specific, legitimate reasons based on

15   substantial evidence if she rejects the opinion of a treating or examining physician, but contends

16   that ALJ did just that.  Def.'s Mot. for Summ. J. at 6-7.  The ALJ provided specific and

17   legitimate reasons for rejecting Dr. Richwerger's opinion; found that Dr. Richwerger's opinion

18   was inconsistent with treatment notes from Charles J. Wood, a psychologist who treated plaintiff

19   on May 17, 2006 and May 23, 2006, and who noted that there was no evidence that Plaintiff was

20   responding to internal stimuli or hearing voices; and did not reject Dr. Kalman's opinion (which

21   was not inconsistent with the ALJ's decision).  *Id.*

22   *////*

23

24        [7]  Plaintiff contends that "[t]o the extent the Commissioner tries to argue that [plaintiff]
did not require a breathing machine or that it could be performed in less than 45 minutes (even

25   though there is no evidence to this effect), the ALJ's decision stands as the final decision of the
Commissioner."  Pl.'s Mot. for Summ. J. at 20-21.  However, as noted above, the ALJ's decision
did expressly call into question plaintiff's statements that he requires a breathing machine during

26   the workday and that it requires at least 45 minutes to operate.

1        The weight given to medical opinions depends in part on whether they are proffered by

2   treating, examining, or non-examining professionals. *Lester*, 81 F.3d at 830.  Ordinarily, more

3   weight is given to the opinion of a treating professional, who has a greater opportunity to know

4   and observe the patient as an individual. *Id*.; *Smolen*, 80 F.3d at 1285.  To evaluate whether an

5   ALJ properly rejected a medical opinion, in addition to considering its source, the court

6   considers whether (1) contradictory opinions are in the record; and (2) clinical findings support

7   the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical

8   professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831.  In contrast, a

9   contradicted opinion of a treating or examining professional may be rejected for "specific and

10  legitimate" reasons, that are supported by substantial evidence. *Id*. at 830.  While a treating

11  professional's opinion generally is accorded superior weight, if it is contradicted by a supported

12  examining professional's opinion (e.g., supported by different independent clinical findings), the

13  ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

14  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

15       Here, the ALJ considered all medical opinions in the record, including those of Drs.

16  Richwerger and Kalman.  AR 10-12.  The ALJ set out a thorough summary of the facts and

17  conflicting clinical evidence, discussing the treating and examining physicians' findings and

18  conclusions. *Id.*

19       First, the ALJ provided specific, legitimate reasons based on substantial evidence for

20  rejecting the opinion of Dr. Richwerger, a consulting, examining psychologist.  The ALJ found

21  that Dr. Richwerger's opinion was inconsistent with treatment notes from Charles J. Wood, a

22  psychologist who treated plaintiff on May 17, 2006 and May 23, 2006, who noted that despite

23  plaintiff's allegation of difficulty sleeping because of hearing voices, "he did not appear to be

24  sleep deprived or responding to internal stimuli" and there was no evidence plaintiff was

25  responding to voices.  AR 11.  Dr. Wood's opinion was also consistent with the February 2006

26  assessment by Dr. Graff that plaintiff was malingering, and the August 2006 opinion of Dr.

1    Schrift that plaintiff had no medically determinable mental impairment.  *Id.*

2         The ALJ also discredited Dr. Richwerger's opinion because Dr. Richwerger was unable

3    to objectively test plaintiff for malingering and his examination of plaintiff lacked various

4    scorable test results.  AR 11.  The ALJ noted that Dr. Richwerger was unable to test for memory

5    malingering because plaintiff did not appear able to focus; the Bender-Gestalt-II, an intelligence

6    test, could not be scored because of plaintiff's "scribbles"; no results from Trails B were

7    provided because plaintiff "became agitated and would not focus on the test"; and plaintiff

8    became "agitated and paranoid" when attempting the Wechsler Memory Scales III or the Wide

9    Range Achievement Test, III.  *Id.*  The ALJ specifically stated that Dr. Richwerger "was

10   obviously persuaded by [plaintiff's] presentation or performance but . . . was unable to

11   objectively test him for malingering."  *Id.*; *see Andrews*, 53 F.3d at 1043; *Reddick v. Chater*, 157

12   F.3d 715, 725 (9th Cir. 1998); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ

13   may reject opinion of treating physician if it is unsupported by treatment notes or objective

14   medical findings).   Moreover, Dr. Richwerger's opinion was based on plaintiff's own subjective

15   complaints and behavior, which the ALJ found to not be credible.  *See Morgan v. Comm'r of

16   Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (physician's opinion properly disregarded if

17   premised on claimant's discounted subjective complaints).  Significantly here, plaintiff does not

18   challenge the ALJ's assessment discrediting significant aspects of his testimony.  Accordingly,

19   the ALJ properly rejected Dr. Richwerger's opinion.

20        Second, the ALJ did not reject, and was not inconsistent with, the opinion of Dr. Kalman,

21   a consulting, examining psychiatrist.  As the ALJ noted, Dr. Kalman's examination showed that

22   plaintiff had only moderate limitations and was not cooperative with the interview.  AR 12.  Dr.

23   Kalman opined that plaintiff was not significantly limited in his ability to understand and

24   remember very short and simple repetitive instructions; was mildly limited in his ability to

25   remember locations and work-like procedures, to carry out short and simple instructions or tasks,

26   to maintain attention and concentration for extended periods, to perform activities within a

schedule, to sustain an ordinary routine without special supervision, to make simple work-related

decisions, to ask simple questions or request assistance, to maintain socially appropriate

behaviors, to respond appropriately to expected or unexpected changes, to be aware of hazards

and take precautions, to travel in unfamiliar places, and to set realistic goals; and he was

moderately limited in his ability to understand and remember detailed instructions or tasks, to

carry out detailed instructions, to work in coordination with or proximity to others without being

unduly distracted by them, to complete a normal workday and workweek without interruption

from psychologically based symptoms, to perform at a consistent pace without an unreasonable

number and length of rest periods, to interact appropriately with the general public or customers,

to accept instructions and to respond appropriately to criticism from supervisors, and to get along

with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  AR

387-89.  Importantly, Dr. Kalman opined that plaintiff was not the type of person for whom a

routine, repetitive, simple, entry-level job would serve as a stressor which would exacerbate

instead of mitigate psychological symptoms in the workplace.  *Id.*  To the extent plaintiff

contends that Dr. Kalman's opinion suggests a more severe mental impairment, that opinion is

also inconsistent with the treatment notes from Dr. Wood, the assessment by Dr. Graff that

plaintiff was malingering, and the opinion of Dr. Schrift that plaintiff had no medically

determinable mental impairment, and for the reasons stated above with regard to Dr. Richwerger,

the ALJ found those other opinions more persuasive.  *Id.*

The ALJ took into account all medical evidence and opinions relating to plaintiff's

impairments, and appropriately resolved conflicts in the evidence.  Therefore, plaintiff is not

entitled to relief on this ground.

////

////

////

////

VI. <u>CONCLUSION</u>

      In conclusion, the court finds that the ALJ's decision is supported by substantial evidence in the record and based on the proper legal standards.  Therefore, IT IS RECOMMENDED that:

      1.  Plaintiff's motion for summary judgment be denied;

      2.  The Commissioner's cross-motion for summary judgment be granted; and

      3.  The Clerk be directed to enter judgment in the Commissioner's favor.

      These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 8, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE